# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                                    No. CR 15-3955 JB

DARRYL J. GUTIERREZ,

     Defendant.

## <u>AMENDED[1] MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Motion to Show Cause, filed August 8, 2016 (Doc. 29)("Motion"). The Court held hearings on August 19, 2016; September 6, 2016; and September 28, 2016. The primary issues are: (i) whether Defendant Darryl J. Gutierrez is financially qualified under the Criminal Justice Act of 1964, 18 U.S.C. § 3006A ("CJA"), to continue to receive the unpaid assistance of a Federal Public Defender; and (ii) whether, if Gutierrez is not financially qualified, he should be compelled to make partial payment for the Federal Public Defender's representation. The Court concludes that Gutierrez is not qualified under the CJA, largely because he has an $800,000.00 annuity to draw upon to pay an attorney. Accordingly, the Court determines that he should make a payment to the United States Department of the Treasury for his representation by the Federal Public Defender's Office. The Court grants the Motion.

---

[1]The Court originally filed this Memorandum Opinion and Order under seal, because of potentially sensitive information about Defendant Darryl Gutierrez' finances and sensitive information about the Federal Public Defender's Office. The Court gave Gutierrez and the Federal Public Defender's Office ten days to propose redactions. Neither provided any proposed redactions. The Federal Public Defender's Office noted, however, that their investigator, Maclovia Guardiola, is a woman, but the Court had used masculine pronouns and honorifics for her in its original Memorandum Opinion and Order. <u>See</u> Letter from Federal Public Defender to the Honorable James O. Browning at 1 (dated May 4, 2018), filed May 4, 2018 (Doc. 128). In this Amended Memorandum Opinion and Order, the Court has changed the pronouns and honorifics accordingly.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure states: "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). The Court makes the following findings of fact in accordance with rule 12(d) of the Federal Rules of Criminal Procedure:

1.      Gutierrez worked as an engineer at Los Alamos National Laboratories[2] from June, 1981, to April, 2009. See Transcript of Motion Proceedings at 16:22-17:10 (taken September 28, 2016)(Gutierrez, Vierbuchen)(Doc. 55)("Third Tr."); Letter from Los Alamos Scientific Laboratory to Darryl Gutierrez at 1-2 (dated June 16, 1981), filed August 19, 2016 (Doc. 32)(Bates No. 3239-40); HR Termination Report of Darryl Gutierrez at 1, (dated April 2, 2009)(Doc. 32)(Bates No. 3377).

2.      In 2000, Gutierrez' annual salary was approximately $80,000.00; in 2008, it had increased to $104,000.00. See Darryl Gutierrez 2000 W2 at 1, filed August 19, 2016 (Doc. 32)(Bates No. 2955); Darryl Gutierrez 2008 W2 at 1, filed August 18, 2016 (Doc. 32)(Bates No. 2964).

3.      From July, 2009, to September, 2012, Gutierrez worked at TechUSA, and he had an annual salary of $133,000.00 in 2010. See Letter from Bonnie L. Bryant to Sharon M. Parker at 1

---

[2]Los Alamos National Labs ("LANL") is one of several national laboratories that the United States Department of Energy oversees. See National Laboratories: Department of Energy, at 1 available at https://www.energy.gov/national-laboratories. LANL was founded seventy-five years ago at the height of World War II with "a single purpose: to design and build an atomic bomb." Los Alamos National Laboratory: Our History, at 1 available at http://www.lanl.gov/about/history-innovation/index.php. Since then, LANL's mission remains focused on national security with an emphasis on, among other things: high-energy and applied physics and theory, high-performance computing, and alternative energy projects. See Los Alamos National Laboratory: Our History, at 1 available at http://www.lanl.gov/about/history-innovation/index.php.

(dated June 18, 2013), filed August 18, 2016 (Doc. 32)(Bates No. 3476); Darryl Gutierrez 2010 W2 at 1, filed August 19, 2016 (Doc. 32)(Bates No. 3484).

4.      Gutierrez then worked for a brief stint at Hilton Santa Fe Buffalo Thunder Casino. See Letter from Tina Cheung to Sharon Parker at 1 (dated May 10, 2013), filed August 19, 2016 (Doc. 32)(Bates No. 1602).

5.      At the casino, Gutierrez' pay started at $14.42 per hour, and, in April, 2013, he was promoted to night manager, which had an annual salary of $37,000.00. See Letter from Susan Rivenbark to Darry Gutierrez at 1 (dated April 19, 2013), filed August 19, 2016 (Doc. 32)(Bastes No. 1668); Personnel Authorization Form at 1 (dated January 22, 2013), filed August 19, 2016 (Doc. 32)(Bates No. 1610).

6.      Gutierrez was unemployed from August 2013 to the present. See Draft Transcript of Motion Proceedings at 31:18-20 (taken September 28, 2016)(Gutierrez)("In Camera Tr.").[3]

7.      On November 5, 2015, a Grand Jury returned an eleven-count indictment against Gutierrez. See Indictment at 1-9, filed November 5, 2015 (Doc. 1)("Indictment").

8.      Count I charges Gutierrez with corruptly endeavoring to obstruct and impede the due administration of Internal Revenue laws from 1997 to 2013, in violation of 26 U.S.C. § 7212(a), by: (i) filing false and fraudulent tax returns with the Internal Revenue Service; (ii) sending frivolous correspondence to the IRS; (iii) filing false W-4 forms with his employers; and (iv) sending correspondence to business and banking institutions to interfere with legal process by the IRS. See Indictment at 1-5.

---

[3]The Court's citations to the draft hearing transcript refer to the court reporter's original, unedited version. There is an official transcript for this hearing that is filed, but the official transcript omits the proceeding's in camera segment. See Third Tr. at 32:3-9 (Court). Accordingly, the Court cites to the draft transcript for the facts attained during the proceeding's in camera portion.

9.      Counts II through XI charge Gutierrez with making and subscribing false income tax returns for tax years 2000 through 2009, in violation of 26 U.S.C. § 7206(1).  <u>See</u> Indictment at 5-9.

10.     The Indictment alleges that, from 2000 to 2009, Gutierrez claimed tax refunds totaling $173,526.00, whereas, in fact, he owed $125,624.00 in unpaid income taxes, "such that his false claims totaled approximately $299,150, not including interest and penalties."  Indictment at 1.

11.     In 2015, Gutierrez withdrew $128,800.00, after taxes, from two Individual Retirement Accounts ("IRAs").  <u>See</u> In Camera Tr. at 36:12-14 (Court, Gutierrez); <u>See</u> Online Account Information (dated July 22, 2016), filed August 19, 2016 (Doc. 32)(Bates No. 4509).

12.     Gutierrez withdrew $84,000.00 from one IRA with no taxes withheld.  <u>See</u> Online Account Information (dated July 22, 2016), filed August 19, 2016 (Doc. 32)(Bates No. 4508)

13.     He withdrew $56,000.00 from the other IRA, $11,200.00 of which was withheld in taxes.  <u>See</u> Online Account Information (dated July 22, 2016), filed August 19, 2016 (Doc. 32)(Bates No. 4509).

14.     Gutierrez was arrested on December 2, 2015.  <u>See</u> Arrest of Darryl J. Gutierrez (entered December 2, 2015)(text-only entry).

15.     When he was arrested, Gutierrez' income was a $7,000.00 per month distribution from an IRA.  <u>See</u> In Camera Tr. at 30:16-19 (Gutierrez).

16.     As of September 28, 2016, however, that IRA was depleted and Gutierrez began withdrawing $6,400.00 per month, after taxes, from a variable annuity.  <u>See</u> In Camera Tr. at 30:21-31:12 (Court, Gutierrez); Third Tr. at 22:10-11 (Gutierrez).

17.     The annuity's total value "was a little over [$]800,000."  In Camera Tr. at 31:16-17 (Gutierrez).

18.     Gutierrez believed that he would be able to withdraw a lump sum amount from the annuity to pay for an attorney.  <u>See</u> In Camera Tr. at 41:17-19 (Gutierrez).

19.     He also has a credit line from which he thought he would be able to borrow funds to pay for an attorney.  <u>See</u> In Camera Tr. at 41:19-20.

20.     Apart from the annuity, Gutierrez owns no other stocks or bonds.  <u>See</u> In Camera Tr. at 32:25-33:4 (Court, Gutierrez).

21.     Gutierrez does not own the home in which he resides; the Housing Authority for the Pojoaque Pueblo owns the home.  <u>See</u> In Camera Tr. at 32:5-8 (Gutierrez).

22.     Gutierrez receives, however, a $600.00 per month stipend from the Pojoaque Pueblo to maintain that house and property.  <u>See</u> In Camera Tr. at 33:24-34:2 (Court, Gutierrez).

23.     Gutierrez owns a time share in Pagosa Springs, Colorado, valued at around $15,000.00.  <u>See</u> In Camera Tr. at 32:18-22 (Court, Gutierrez); <u>id.</u> at 35:8-9 (Gutierrez).

24.     He also owns a 2007 Toyota 4Runner valued at about $8,000.00.  <u>See</u> In Camera Tr. at 33:10-12 (Court, Gutierrez).

25.     Gutierrez values his personal property, <u>e.g.</u>, furniture, paintings, at $15,000.00.  <u>See</u> In Camera Tr. at 35:9-10 (Gutierrez).

26.     Gutierrez' monthly expenses include "[m]onthly utilities, gas, electric, cellphone, cable, and the maintenance fees from the time share."  In Camera Tr. at 35:16-17 (Gutierrez).

27.     He has no large monthly debts, however, and he pays the balance of his credit card every month.  <u>See</u> In Camera Tr. at 35:18-36:4 (Court, Gutierrez).

28.     Gutierrez has no dependents.  <u>See</u> In Camera Tr. at 36:17-18 (Gutierrez).

29.     Gutierrez has not arranged for someone else to hold onto his money in that person's name and to return that money to Gutierrez at a later date.  <u>See</u> In Camera Tr. at 33:16-21 (Court, Gutierrez).

30.     Gutierrez gambled away the majority of his 2015 $128,800.00 IRA withdrawal.  <u>See</u> In Camera Tr. at 36:12-14 (Court, Gutierrez); <u>id.</u> at 37:4-8 (Court, Gutierrez).

31.     His $7,000.00 per month IRA withdrawal also went into gambling.  <u>See</u> In Camera Tr. at 37:18-23 (Court, Gutierrez).

32.     The United States estimated that, without interest and penalties, it would seek in restitution about $126,000.00 in back taxes.  <u>See</u> Third Tr. at 35:9-11 (Vierbuchen).[4]

33.     Amber Fayerberg, a New Mexico defense attorney with Freedman Boyd Hollander Goldberg Urias & Ward P.A., represented to Gutierrez that she would take his case for $100,000.00.  <u>See</u> In Camera Tr. at 42:8-10 (Gutierrez); Third Tr. at 21:2-3 (Gutierrez, Vierbuchen).

34.     Since Gutierrez was arrested, he has had the resources to hire a private attorney.  <u>See</u> In Camera Tr. at 39:7-11 (Court, Gutierrez).  <u>See</u> <u>id.</u> at 30:16-19 (Gutierrez)(stating that, at the time of his arrest, Gutierrez received a $7,000.00 per month distribution); <u>id.</u> at 30:21-31:12 (Court, Gutierrez)(stating that, after that IRA was depleted, Gutierrez received a $6,400.00 per month annuity payment); <u>Id.</u> at 31:16-17 (Gutierrez)(stating that Gutierrez had $800,000.00 in an annuity); Third Tr. at 17:17-19 (Gutierrez, Vierbuchen)(Gutierrez' admission that he has had the financial resources to hire an attorney).

---

[4]The United States subsequently represented that the total amount it would seek including interest and penalties would be $284,157.65.  <u>See</u> Penalties and Interest for Darryl Gutierrez for 200 thru 2009 at 1, filed October 7, 2016 (Doc. 41-1).  Gutierrez final restitution owed equals $174,196.00; the United States also assessed a $15,000.00 fine.  <u>See</u> Transcript of Motion Proceedings at 9:6-7 (taken September 19, 2017)(Court)(Doc. 117)("Sentencing Tr."); United States' Response to Motion to Withdraw as Counsel ¶ 3, at 2 (filed April 10, 2017)(Doc. 122).

35.     A probation officer filled out a Financial Affidavit for Gutierrez based on information Gutierrez relayed.  See Third Tr. at 18:20-19:2 (Court, Gutierrez, Vierbuchen).  See also Financial Affidavit at 1 (unsigned and undated)(Doc. 7)("Financial Affidavit").

36.     The Financial Affidavit lists that Gutierrez' monthly income is $7,000 from an IRA. See Financial Affidavit at 1.

37.     Gutierrez did not ask for an Assistant Federal Public Defender to represent him.  See Third Tr. at 17:20-24 (Gutierrez, Vierbuchen).

38.     The Honorable Steven C. Yarborough, United States Magistrate Judge for the District of New Mexico, however, appointed an Assistant Federal Public Defender -- John V. Butcher -- to represent Gutierrez.  See Order Appointing Federal Public Defender (text-only order), entered December 2, 2015 (Doc. 8); Third Tr. at 19:3-6 (Gutierrez, Vierbuchen).

39.     In 2015, Mr. Butcher worked on Gutierrez' case for 26.85 hours.  See Case History Report at 1-3 (dated October 19, 2016), filed October 23, 2017 (Doc. 44)("Case History Report").

40.     In 2016, Mr. Butcher worked on Gutierrez' case for 87.41 hours.  See Case History Report at 4-22.[5]

41.     In total, Mr. Butcher worked 114.26 hours on Gutierrez' case.  See Case History Report at 1-22.

42.      For 2015, the CJA billing rate was $127.00 per hour.  See Email from Christopher J. Gooch, Financial Services Supervisor, to K'Aun Wild at 1 (dated December 5, 2016)(on file with the Court)("Billing Email").

---

[5]Christopher Gooch, Financial Services Supervisor for the United States District Court for the District of New Mexico calculates Mr. Butcher's 2016 hours for the Gutierrez case at 87.48 hours.  See Email from Christopher J Gooch, Financial Services Supervisor, to K'Aun Wild at 1 (dated December 5, 2016)(on file with the Court).  After triple checking its arithmetic, the Court concludes that, based on the Case History Reports, Mr. Butcher's 2016 hours for Gutierrez case is 87.41 hours.

43.     For 2016, the CJA billing rate was $129.00 per hour.  <u>See</u> Billing Email at 1.

44.     Based on the CJA rates and hours that Mr. Butcher worked, his services to Gutierrez' case is valued at $14,685.84.  <u>See</u> Case History Report at 1-22; Billing Email at 1.

45.     In addition to Mr. Butcher, another Assistant Federal Public Defender, Dick Winterbottom, worked on Gutierrez' case for .67 hours.  <u>See</u> Case History Report at 4.

46.     Based on the CJA rates and the hours Mr. Winterbottom worked, his services to Gutierrez' case is valued at $86.43.  <u>See</u> Case History Report at 4; Billing Email at 1.

47.     Stephanie Porter, a paralegal for the Federal Public Defender's Office, worked for 80.7 hours on Gutierrez Case.  <u>See</u> Case History Report at 1-22.[6]

48.     The CJA rate for a paralegal is $25 per hour.  <u>See</u> Billing Email at 1.

49.     Based on that billing rate and the hours that Ms. Porter worked, her services to Gutierrez' case are valued at $2,017.50.  <u>See</u> Case History Report at 1-22; Billing Email at 1.

50.     The Federal Public Defender's Office used Maclovia Guardiola, an investigator, for Gutierrez' case, and Guardiola worked 42.5 hours.  <u>See</u> Case History Report at 2-20; Billing Email at 1.

51.     The CJA rate for an investigator is $50 per hour.  <u>See</u> Billing Email at 1.[7]

52.     Based on that billing rate and hours she worked, her services to Gutierrez' case are valued at $2,125.00.  <u>See</u> Case History Report at 2-20; Billing Email at 1.

---

[6]Mr. Gooch calculates Ms. Porter's hours for the Gutierrez case at 81.03 hours.  <u>See</u> Billing Email at 1.  After, again, triple checking its arithmetic, the Court concludes that, based on the Case History Reports, Ms. Porter's hours for Gutierrez' case is 80.7 hours.

[7]Mr. Gooch notes that the CJA rate for an investigator ranges from $50.00 to $65.00 per hour, but selected $50.00 per hour for Ms. Guardiola.  <u>See</u> Billing Email at 1.  The Court sees no reason to doubt Mr. Gooch's selection on this matter, so concludes that the billing rate for Ms. Guardiola is $50.00 per hour.

53.     In total, the Federal Public Defenders Office's services to Gutierrez' case are valued at $18,914.77. See Case History Report at 1-22; Billing Email at 1.

54.     On September 28, 2016, Gutierrez represented that he did not want to proceed in his case pro se and that he "[d]efinitely" wanted an attorney representing him. Third Tr. at 23:6-8 (Gutierrez); id. at 23:19-24 (Court, Gutierrez).

55.     On November 1, 2016, Mr. Butcher was relieved as Gutierrez' attorney, and the Court appointed Jason Bowles as Gutierrez' attorney. See CJA Appointment of Attorney Jason Bowles for Darryl J Gutierrez (text-only order)(Doc. 45).

## PROCEDURAL BACKGROUND

Gutierrez made an initial appearance before Magistrate Judge Yarbrough on December 2, 2015. See Clerk's Minutes before Magistrate Judge Steven C. Yarbrough at 1, filed December 2, 2015 (Doc. 5). Gutierrez was arraigned the following day, December 3, 2015. See Clerk's Minutes before Magistrate Judge Steven C. Yarbrough at 1, filed December 3, 2015 (Doc. 9). Judge Yarbrough released Gutierrez on his own recognizance, see Order Setting Conditions of Release at 1, filed December 3, 2015 (Doc. 11), and subsequently placed him under the pretrial supervision of United States Probation Officer Jeffrey Martinez-Spelich, see Officer Jeffrey Martinez-Spelich Added (entered December 7, 2015)(text-only entry).

### 1.     The Motion to Show Cause.

Plaintiff United States of America moves for an order to show cause why Gutierrez should continue to receive an Assistant Federal Public Defender's assistance without paying for that representation. See Motion at 1. The United States' primary argument is that Gutierrez is not qualified for an Assistant Federal Public Defender's services, because, based on Gutierrez' income history and IRA funds, he is "financially able to obtain counsel or to make partial payment for the

representation." Motion at ¶ 8, at 3. The United States adds that Gutierrez has the burden of establishing that he or she is financially unable to obtain an attorney, and that, if a court determines post-appointment of counsel that "the person is financially able to obtain counsel or to make partial payment for the representation," a court "may terminate the appointment of counsel or authorize payment . . . , as the interests of justice may dictate." Motion ¶ 7, at 3 (citing CJA § 3006AI)(internal quotation marks omitted). The United States argues that, based on Gutierrez' financial situation, he is "financially able to obtain counsel or to make partial payment for the representation." Motion ¶ 8, at 3.

In conclusion, the United States notes that Mr. Butcher, Gutierrez' appointed counsel, "takes no position concerning whether [he] or other counsel should be appointed or whether any defendant should make payments to the CJA fund." Motion ¶ 9, at 4. The United States notes that Mr. Butcher encourages the Court, however, to "make sure that a licensed member of the bar . . . continues to represent Mr. Gutierrez, if that is his desire." Motion ¶ 9, at 4.

2.    **The First Hearing.**

The Court held the first hearing on the Motion on August 19, 2016. See Transcript of Motion Proceedings at 1 (held on August 19, 2016), filed September 16, 2016 (Doc. 34)("First Tr."). Before reaching the Motion's merits, Gutierrez asserted that he wishes to maintain a traditional attorney/client relationship with Mr. Butcher and have Mr. Butcher participate in trial by conducting direct- and cross-examinations "and things like that." First Tr. at 12:14-25 (Butcher). Turning to the merits, the United States largely reiterated the Motion's financial data about Gutierrez and argued that Gutierrez "has a substantial amount of money," so his court-appointed attorney should be dismissed. First Tr. at 13:23-14:1 (Vierbuchen). The United States clarified that its familiarity with

Gutierrez' financial situation is somewhat limited, however, because it had not seen a full version of Gutierrez' financial affidavit. See First Tr. at 15:5-18 (Vierbuchen).

The Court turned to Gutierrez, asking whether he or Mr. Butcher opposed the United States viewing the financial disclosure form that Gutierrez executed for probation and Judge Yarbrough. See First Tr. at 15:19-23 (Court). In response, Mr. Butcher stated that, because "the Office of the Federal Defender takes no position to whether we should be appointed," he had no position with respect to the disclosure of Gutierrez' finances for purposes of the hearing. First Tr. at 15:24-16:5 (Butcher). Mr. Butcher also asserted, however, that Gutierrez' financial disclosure should not be admitted at trial; instead, he encouraged the Court to conduct an in-camera inspection of the document. See First Tr. at 16:8-12 (Butcher). The Court interjected, proposing that Mr. Butcher examine the document -- which he presumably had not yet seen -- to determine whether he had any objection to it being shown to the United States. See First Tr. at 16:14-22 (Court).

The Court turned to the United States and inquired whether the Court should hold a separate hearing on the matter, to which the United States responded that it would not be opposed. See First Tr. at 17:2-5 (Court, Vierbuchen). The United States clarified that, although its central objective in filing the Motion was to alert the Court to Gutierrez' potentially disqualifying financial situation, a further hearing may be appropriate at the Court's discretion. See First Tr. at 18:5-18 (Vierbuchen). The United States reminded the Court that it does not have current information regarding Gutierrez' account balances; however, the United States asserted that Gutierrez had more than $700,000.00 in 2006, and that the current figure is likely higher, because he continued to work for several years after that and had a second IRA. See First Tr. at 20:4-25 (Vierbuchen). The United States cited Gutierrez' comment to Mr. Martinez-Spelich that he withdraws $7,000.00 each month from an IRA as evidence that he likely has access to considerable funds at the present. See First Tr. at 21:10-17

(Vierbuchen).  The United States emphasized that this sum is especially large, because Gutierrez does not have any rent or mortgage obligations.  See First Tr. at 21:18-22 (Vierbuchen).

After reviewing the document, Mr. Butcher rejoined that the Court should look at the financial disclosure form in camera.  See First Tr. at 18:15-16 (Butcher).  He also argued that, even if Gutierrez has a large amount of money now, Gutierrez might still qualify for an Assistant Federal Public Defender, because the IRS would presumably seize that money.  See First Tr. 18:19-23 (Butcher).  The Court clarified with the United States that the United States was seeking about $300,000.00 from Gutierrez, see First Tr. at 19:16-17 (Court), and that, at least in 2006, Gutierrez had more than $700,000.00 in an IRA, see First Tr. at 20:1-16 (Court, Vierbuchen).  Mr. Butcher again recommended that the Court perform an in-camera review of Gutierrez' financial disclosure, because such information might expose Gutierrez to additional criminal liability, so the United States may not be entitled to such information under the Sixth Amendment of the Constitution of the United States.  See First Tr. at 22:6-18 (Butcher).  Accordingly, Mr. Butcher proposed that the Court hold this issue in abeyance until after trial, at which point, if Gutierrez is acquitted, the Court can inquire whether Gutierrez should pay back the cost of his defense.  See First Tr. at 22:25-23:3 (Butcher).  If Gutierrez is found guilty, Mr. Butcher continued, the Court can inquire whether his money should go to the IRS or any other restitution the Court may deem appropriate.  See First. Tr. at 23:4-7 (Butcher).  Mr. Butcher stated that he takes no position regarding whether Gutierrez should ultimately be required repay the Federal Public Defender's office for its services, however.  See First Tr. at 23:15-18 (Butcher).

The United States took up argument, emphasizing that it "very much wants Mr. Gutierrez to have an attorney."  First Tr. at 24:1-2 (Vierbuchen).  The United States maintained, however, that Gutierrez can afford an attorney and therefore does not qualify for CJA assistance.  See First Tr. at

24:2-4 (Vierbuchen).  The United States also argued that holding the issue in abeyance as Mr. Butcher suggests misses the point -- Gutierrez should not receive any unpaid assistance "if he truly has the income that the Government's filing suggests."  First Tr. at 24:20-24 (Vierbuchen).

Mr. Butcher interjected, asserting that he is not proposing that Gutierrez receive any unpaid assistance, but rather, should the Court determine that Gutierrez is not financially qualified for such assistance, that he "pay back the reasonable costs of his defense."  First Tr. at 24:25-24:16 (Butcher). That determination can be made at any time by the Court, Mr. Butcher asserted, whether before or after trial.  See First Tr. at 25:16-18 (Butcher).  Mr. Butcher summarized his position, stating that he is not suggesting that Gutierrez should receive free representation or that he should acquire his own; instead, he stated, "the CJA Act allows something in between where he can get a CJA attorney or a federal public attorney, but has to pay back some or all that cost."  First Tr. at 25:18-22 (Butcher).

The United States, in reply, suggested that, if the Court entertains the issue, "Gutierrez' bond conditions need to be modified and he needs to put up a significant amount of money to pay for the eventuality [] that may occur."  First Tr. at 26:3-7 (Vierbuchen).  The United States expressed concern that Gutierrez "has not paid taxes for years and he appears to be hiding money . . . . He's withdrawing $7,000 a month . . . and not paying taxes."  First Tr. at 26:7-11 (Vierbuchen).  In the end, the United States posited, "maybe the money is not going to be there to pay, if we wait until the end of the trial and the disposition in this case."  First Tr. at 26:11-14 (Vierbuchen).

The Court informed the parties that it would set a date for a hearing to show cause, and that Gutierrez could, in his discretion, present additional information in his defense.  See First Tr. at 26:15-21 (Court).  The Court noted that it was not requiring Gutierrez to submit additional information, if Gutierrez decided that disclosing his financial information was against his interest or if there were Fifth Amendment of the Constitution of the United States problems.  See First Tr. at

26:17-21 (Court). Mr. Butcher stated that he "would be surprised" if he presented more information. See First Tr. at 27:9-11 (Butcher). The Court concluded by clarifying that Mr. Butcher would remain Gutierrez' attorney until the Court removed him. See First Tr. at 27:18-19 (Court).

   **3.     The Second Hearing.**

The Court held a show cause hearing on September 6, 2016. See Transcript of Show Cause Proceedings at 1 (held on September 6, 2016), filed October 18, 2016 (Doc. 42)("Second Tr."). The Court opened by stating that, according to the Court's Courtroom Deputy, Gutierrez "wants to retain counsel, private counsel, to represent him." Second Tr. at 2:22-24 (Court). This request, the Court noted, possibly moots the United States' Motion. See Second Tr. at 2:24-3:1 (Court). Mr. Butcher confirmed that Gutierrez wants to retain his own attorney, and that he "would request a continuance of the trial date so he can retain his own attorney." Second Tr. at 3:4-6 (Butcher). In response, the United States asked for clarification from Gutierrez whether "he is conceding that he is financially able to obtain counsel, in light of . . . the fact that the Government has highlighted some information that suggests that the defendant has substantial assets." Second Tr. at 3:14-20 (Vierbuchen). The United States contended that "it should be clear that he's doing that because he agrees that he is not entitled to a Public Defender." Second Tr. at 3:20-21 (Vierbuchen). Mr. Butcher answered, arguing that "the right to retain counsel is not based upon finances, in the sense that [Gutierrez] only is entitled to counsel if he doesn't have the finances." Second Tr. at 4:1-3 (Butcher). That Gutierrez has requested to hire an attorney, Mr. Butcher contended, should end the inquiry, without regard to Gutierrez' finances. See Second Tr. at 4:4-6 (Butcher).

The Court proposed to postpone its resolution of the Motion and inquired where Gutierrez is in the process of selecting an attorney. See Second Tr. at 4:7-10 (Court). Gutierrez replied that he has "not begun that process." Second Tr. at 4:11-12 (Gutierrez). The Court expressed its concern

with Gutierrez' status and proposed to give him until September 20, 2016 to find counsel. <u>See</u> Second Tr. at 4:13-16 (Court); <u>id.</u> at 5:16-24 (Butcher, Court). The Court cautioned that, if Gutierrez had not yet retained counsel by then, the Court would revisit the Motion and examine whether Gutierrez should provide information about his assets. <u>See</u> Second Tr. at 5:16-21 (Court).

    **4.**     **<u>The Third Hearing</u>.**

The Court held a third hearing on September 28, 2016. <u>See</u> Third Tr. at 1:1. The Court opened by noting that Gutierrez had not yet retained counsel. <u>See</u> Third Tr. at 3:3-4 (Court). The Court indicated that it understood the United States' position to be that it will oppose a continuance until Gutierrez acquires a new attorney, and that Gutierrez contends that he cannot acquire an attorney without a continuance. <u>See</u> Third Tr. at 3:4-9 (Court). Given this dilemma, the Court proposed to remove Mr. Butcher from the case and appoint an attorney from the CJA panel. <u>See</u> Third Tr. at 3:10-15 (Court). The Court stated that its primary concern is avoiding a gap in Gutierrez' representation. <u>See</u> Third Tr. at 3:17-18 (Court). The Court added that, should Gutierrez disagree with the Court's selection, he may select someone else. <u>See</u> Third Tr. at 3:18-23 (Court). The Court revealed, however, that it was likely to grant a continuance regardless. <u>See</u> Third Tr. at 3:24-25 (Court).

The United States asked for clarification, inquiring whether the Court, in proffering the above proposal, was granting the United States' Motion. <u>See</u> Third Tr. at 6:17-18 (Vierbuchen). The United States further queried whether the Court's intention was for Gutierrez to work out a retainer agreement with the assigned CJA attorney or whether public funds would be expended. <u>See</u> Third Tr. at 6:19-22 (Vierbuchen). If the latter is true, the United States asserted, the Court should conduct a hearing on the Motion. <u>See</u> Third Tr. at 6:23-24 (Vierbuchen).

The Court responded, stating: "I thought we had the hearing on the Government's motion. I now need to rule on it." Third Tr. at 7:1-3 (Court). The Court indicated that it already made clear that Gutierrez "has to retain his own counsel" and that "he may have to reimburse money to the Government." Third Tr. at 7:4-6 (Court). The Court stated, however, that, because the case had to move forward, it was inclined to appoint an attorney and remove Mr. Butcher -- and thus the Federal Public Defender's office -- from the case. See Third Tr. at 7:6-12 (Court). The Court reasoned that, if necessary, it can revisit the issue later, but that it would be unwise to continue to wait for Gutierrez to get an attorney. See Third Tr. at 7:13-18 (Court).

Notwithstanding the Court's inclination to revisit the issue later, the United States argued that, whether in camera or otherwise, the Court should examine Gutierrez' financial affidavit to determine whether he has the resources to obtain counsel, and also whether Gutierrez wished to retain counsel or represent himself. See Third Tr. at 8:19-9:5 (Vierbuchen). The United States contended that, if he has the financial resources or wishes to represent himself, "the public defender, or CJA should not be in here," and Gutierrez should be "advised of his right to get an attorney and of his right [to] represent himself as well as cautioned about the dangers of representing [him]self." Third Tr. at 8:24-9:5 (Vierbuchen). The United States stated that, in any event, it was concerned about the Court striking Mr. Butcher and then appointing another attorney, because it is "not clear that that is the defendant's desire," but that it is "the Government's desire to have him represented." Third Tr. at 9:6-10 (Vierbuchen). The United States also said that Mr. Butcher had represented to it that Gutierrez wished to continue with Mr. Butcher, but that the United States was mainly concerned with Gutierrez saying later, on appeal, that "I never had a chance to represent myself or [that] I was appointed counsel that I didn't want." Third Tr. at 10:14-16 (Vierbuchen). It added that the United States also "wanted to move this case along," but that its position remained "that if the defendant is

financially able to retain counsel, I do not believe there is authority for the Court to continue to order the public trust to be used to fund his representation." Third Tr. 10:17-24 (Vierbuchen).

The United States also argued that, because Gutierrez had not found an attorney in three weeks, after representing that he would, Gutierrez may have waived his right to hire an attorney, so may need to proceed pro se. See Third Tr. at 11:15-12:1 (Court, Vierbuchen). The United States clarified that Gutierrez may not have yet waived his right to hire an attorney, but that there needs to be a hearing where Gutierrez either states he has the money to hire an attorney or he does not. See Third Tr. at 12:2-6 (Vierbuchen). The Court then stated it had already had two hearings on the issue, it believed that Gutierrez had said everything he had wanted to say on the issue, and that the Court had taken the Motion under advisement. See Third Tr. at 12:16-22 (Court).

Mr. Butcher reiterated that his office takes no position on whether his office should be appointed to represent Gutierrez. See Third Tr. 13:9-12 (Butcher). He also stated that it was his understanding that Gutierrez "does not challenge that he has the resources to hire an attorney," and that he would have no objection if the Court needed Gutierrez to say that on the record. Third Tr. at 13:13-17 (Butcher). He argued, however, that if the Court wanted a more detailed conversation about Gutierrez' assets, it should be done in camera. See Third Tr. at 13:17-19 (Butcher). Finally, he stated that he believed Gutierrez "was willing to go forward with me, with the understanding that he may have to pay back the CJA fund." Third Tr. at 13:22-24 (Butcher).

The Court concluded that it would like to create a record, so it swore in Gutierrez as a witness. See Third Tr. at 14:20-21 (Court); id. at 16:7-15 (Wild, Court). After hearing some of Gutierrez' testimony,[8] the United States subsequently argued that, because Gutierrez conceded he had the money to obtain counsel, the CJA precludes Gutierrez from having an Assistant Federal

---

[8]Relevant portions of that testimony is reproduced in the Factual Findings section.

Public Defender.  See Third Tr. at 26:23-27:2 (Vierbuchen).  The United States added that, if the Court was still inclined to let Gutierrez have an Assistant Federal Public Defender as an attorney and pay the CJA back later, the Court's in camera review of Gutierrez' finances was still necessary.  See Third Tr. at 27:2-6 (Vierbuchen).  The Court concluded that an in camera review was still necessary.  See Third Tr. at 27:9-13 (Court).  Before continuing, Mr. Butcher argued that the Court should focus its questions on Gutierrez' current financial resources and not on his past financial resources.  See Third Tr. at 28: 13-15 (Butcher).  The United States rejoined that inquiries into Gutierrez' past resources were still relevant, because it is relevant whether Gutierrez has hidden any money -- perhaps with family members.  See Third Tr. at 29:11-25 (Vierbuchen).  The Court subsequently conducted an in camera review.  See In Camera Tr. at 30:3-49:17 (Butcher, Court, Gutierrez).[9] During the In Camera portion of the proceeding, Mr. Butcher reiterated his argument that, even though Gutierrez had a strong flow of monthly income, he was unsure if that money was legally cognizable under CJA, because there was a chance that the United States could take that money so that Gutierrez would not actually be able to use his money to pay an attorney.  See In Camera Tr. at 39:18-40:25 (Butcher, Court).

After conducting the in camera review, the Court asked Mr. Butcher to furnish the Court the number of hours that he had worked on the case up until the third hearing.  See Third Tr. at 33:15-18 (Butcher, Court); id. at 46:6-7 (Court).  The Court also asked the United States to furnish the Court the estimated tax liability that the United States would seek to recoup from Gutierrez.  See Third Tr. at 35:20-25 (Court, Vierbuchen).  Subsequently, the Court concluded that Gutierrez could pay for an attorney and that he could have paid for an attorney when he was originally arrested.  See Third Tr. at 36:5-8 (Court).  Accordingly, the Court concluded it would order Gutierrez to look for an attorney

---

[9]The relevant portions of the in camera review proceedings are reproduced in the Factual Findings section.

and pay back the value of Mr. Butcher's services.  See Third Tr. at 36:8-11 (Court).  The Court did

not want, however, there to be a gap in Gutierrez' representation, especially because Gutierrez had

represented that he did not want to proceed pro se, so the Court decided to appoint a CJA counsel in

the interim.  See Third Tr. at 36:21-25 (Court).  On November 1, 2016, the Court appointed Jason

Bowles as Gutierrez' attorney, and Mr. Butcher withdrew.  See CJA Appointment of Attorney Jason

Bowles for Darryl J Gutierrez (Doc. 45)(text-only order).[10]

## LAW REGARDING THE CJA

Under the CJA, financially eligible persons receive appointed counsel to assist them.  See 18

U.S.C. § 3006A.  The CJA provides:

(1)      Representation shall be provided for any financially eligible person who --

   (A)      is charged with a felony or a Class A misdemeanor;

   (B)      is a juvenile alleged to have committed an act of juvenile delinquency
            as defined in section 5031 of this title;

   (C)      is charged with a violation of probation;

   (D)      is under arrest, when such representation is required by law;

   (E)      is charged with a violation of supervised release or faces
            modification, reduction, or enlargement of a condition, or extension
            or revocation of a term of supervised release;

   (F)      is subject to a mental condition hearing under chapter 313 of this title;

   (G)      is in custody as a material witness;

   (H)      is entitled to appointment of counsel under the sixth amendment to
            the Constitution;

   (I)      faces loss of liberty in a case, and Federal law requires the
            appointment of counsel; or

---

[10]It is the Court's understanding that Gutierrez and Mr. Bowles worked out a fee
arrangement.

(J)    is entitled to the appointment of counsel under section 4109 of this title.

18 U.S.C. § 3006A(a)(1).  "A person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings."  18 U.S.C. § 3006A(c).  "If at any time after the appointment of counsel," however,

> the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate.

18 U.S.C. § 3006A(c).

> Whenever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, to any person or organization authorized pursuant to subsection (e) to render investigative, expert, or other services, or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section.

18 U.S.C. § 3006A(f).

In 1964, Congress enacted the CJA "to insure effective representation for those charged with a crime or confronted with the risk of being deprived of constitutional rights in ancillary proceedings."  United States v. Gonzalez, 150 F.3d 1246, 1258 (10th Cir. 1998).  Section 3006A states: "Each United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section." 18 U.S.C. § 3006A(a).  A court shall appoint counsel to represent the defendant if it is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel."  18 U.S.C. § 3006A(b).  "Appropriate inquiry necessarily varies with the circumstances presented, and no one method or

combination of methods is required.  Investigation of the applicant's assets, liabilities, income and obligations alone may constitute sufficient inquiry."  <u>United States v. Barcelon</u>, 833 F.2d 894, 897 (10th Cir. 1987)(footnote and citations omitted).  A court may also consider

> the needs of the defendant and his family, <u>United States v. Harris</u>, 707 F.2d 653, 661 (2nd Cir. [1983]), <u>cert. denied</u>, 464 U.S. 997 . . . (1983); <u>U.S. v. Bracewell</u>, 569 F.2d 1194, 1200 (2nd Cir. 1978); the amount the defendant posted as bail, <u>see</u> VII <u>Guide to Judiciary Policies and Procedures: Appointment of Counsel in Criminal Cases</u> ¶ 2.04 at 2-11 (1987); the expense and extent of legal services which the defendant requires, <u>Harris</u>, 707 F.2d at 661, <u>United States v. Coniam</u>, 574 F. Supp. 615, 618 (D.Conn.1983); <u>United States v. Hennessey</u>, 575 F. Supp. 119, 121 (N.D.N.Y.1983), <u>aff'd</u> 751 F.2d 372 (2nd Cir. 1984); amounts given the defendant by others for limited purposes only, <u>Bridges v. United States</u>, 588 F.2d 911, 912 (4th Cir. 1978); <u>United States v. Bursey</u>, 515 F.2d 1228, 1236 (5th Cir. 1975); whether the defendant has secreted assets, <u>United States v. Rubinson</u>, 543 F.2d 951, 964 (2nd Cir. [1976]), <u>cert. denied</u>, 429 U.S. 850 . . . (1976); <u>United States v. Schmitz</u>, 525 F.2d 793, 794-95 (9th Cir. 1975); and the availability of income to the defendant from other sources such as a spouse, <u>United States v. Caudle</u>, 758 F.2d 994 (4th Cir. 1985), or trusts, estates or the like.  <u>See, e.g.</u>, <u>United States v. Kahan</u>, 415 U.S. 239 . . . (1974); <u>Schmitz</u>, 525 F.2d at 794-95.  In addition to these factors the court may also refuse to appoint counsel if it finds that the defendant's portrayal of financial inability lacks credibility.  <u>See</u> <u>United States v. Binder</u>, 794 F.2d 1195, 1202 (7th Cir. [1986]), <u>cert. denied</u>, 479 U.S. 869 . . . (1986); <u>United States v. Kelly</u>, 467 F.2d 262, 266 (7th Cir. 1972); <u>United States v. Martinez-Torres</u>, 556 F. Supp. 1275, 1280 (S.D.N.Y. 1983); <u>United States v. Wright</u>, 478 F. Supp. 1178 (S.D.N.Y. 1979).

<u>United States v. Barcelon</u>, 833 F.2d at 897 n.5 (brackets added).  <u>See</u> <u>United States v. Bayer</u>, 1989 WL 31017, at *1 (N.D. Ill. March 28, 1989)(Rovner, J.)(stating that, in analyzing whether the defendant has met his burden of demonstrating financial inability, courts consider the defendant's assets, liabilities, income, expenses, the defendant's needs, his family's needs, "the potential cost of the defendant's representation, funds given to the defendant by others for limited purposes only, the existence of hidden assets, availability to the defendant of income earned by a spouse or . . . other source, and the credibility of the defendant's representations as to his financial affairs" (citations omitted)).

1.    **Disclosure of Documents Demonstrating a Defendant's Financial Eligibility for Appointed Counsel.**

The CJA is silent about disclosure of documents demonstrating a defendant's financial eligibility for CJA status. See United States v. Gonzalez, 150 F.3d at 1265 ("Neither the statute nor the Administrative Office's rules specify whether [the procedure regarding appointment of counsel] is to be done ex parte."). Because the statute is silent, courts consider the regulations governing the operation of CJA plans. See United States v. Gonzalez, 150 F.3d at 1251-52; United States v. Sandoval, 2010 WL 4338061, at *3 (D.N.M. Oct. 4, 2010)(Browning, J.). Section 3006A states that the "Judicial Conference of the United States may, from time to time, issue rules and regulations governing the operation of plans formulated under this section." 18 U.S.C. § 3006A(h). Accordingly, the Administrative Office of the United States Courts, under the Judicial Conference's direction, promulgated rules and regulations regarding the appointment of counsel under the CJA and related statutes. See Administrative Office of United States Courts, Guide to Judiciary Policy, Vol. 7 - Defender Services, chap. 1, § 120 ("AO Guide"). See also United States v. Gonzales, 150 F.3d at 1252 (stating that the rules set forth in the Guide to Judiciary Policies and Procedures, published by the Administrative Office of United States Courts, govern the administration of the CJA). The Guide to Judiciary Policies and Procedures sets forth the policy regarding the public disclosure of information pertaining to activities under the CJA. See AO Guide, vol. 7, chap. 5, § 510.10. The guide promulgates a general rule of disclosure and gives courts discretion to override it in particular cases. See United States v. Gonzales, 150 F.3d at 1265. The guide states:

> Generally, such information which is not otherwise routinely available to the public should be made available unless it:
>
> (a)    is judicially placed under seal;
>
> (b)    could reasonably be expected to unduly intrude upon the privacy of attorneys or defendants;

(c)　　could reasonably be expected to compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources;

(d)　　or otherwise adversely affect the defendant's right to the effective assistance of counsel, a fair trial, or an impartial adjudication.

AO Guide, vol. 7, chap. 5, § 510.30.  See United States v. Gonzales, 150 F.3d at 1265-66.  When weighing those considerations, courts consider the public's strong and legitimate interest in knowing how its funds are being spent.  See United States v. Gonzales, 1997 WL 155403, at *6 (D.N.M. Feb. 11, 1997)(Vazquez, J.), vacated in part, 150 F.3d 1246 (10th Cir. 1998).

In United States v. Gonzales, the United States Court of Appeals for the Tenth Circuit concluded that backup documentation, motions, orders, and hearing transcripts related to the appointment and compensation of counsel should be sealed, in part, because disclosure of these documents would unduly intrude on the defendants' privacy interests.  See United States v. Gonzales, 150 F.3d at 1265-66.  The Tenth Circuit stated that disclosure of these documents would reveal information that the United States could use to investigate and bring new charges against the defendants.  See United States v. Gonzales, 150 F.3d at 1266 (stating that disclosure "may also put the government in a position to investigate and bring new charges against [defendants who inculpate themselves in uncharged criminal conduct in order to obtain an adequate defense]")(bracketed text in original).  The Tenth Circuit also concluded that releasing this documentation would unduly intrude on the defendants' privacy interests because the information could implicate the defendants' Fifth Amendment to the Constitution of the United States' rights as to the crimes for which they were being tried.  See United States v. Gonzales, 150 F.3d at 1266.

## 2. Terminating the Appointment of Counsel and the Burden of Proof in Termination Proceedings.

The CJA provides for the termination of appointed counsel. Section 3006A states:

If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate.

18 U.S.C. § 3006A(c).

The CJA and its legislative history do not say who holds the burden of proof in appointment-of-counsel or termination-of-counsel proceedings. See 18 U.S.C. § 3006A; United States v. Harris, 707 F.2d 653, 660 (2d Cir. 1983), abrogated on other grounds by, Flanagan v. United States, 465 U.S. 256 (1984). The Tenth Circuit and other federal courts, however, have placed the burden of proof on the defendant. See United States v. Barcelon, 833 F.2d 894, 896 (10th Cir. 1987)("Under the Act the applicant bears the burden of persuading the court that he is financially unable to obtain counsel.")(citing United States v. Harris, 707 F.2d at 660); United States v. Peister, 631 F.2d 658, 662 (10th Cir. 1980)("The burden is on the defendant to demonstrate financial inability in order to obtain counsel."); United States v. Brockman, 183 F.3d 891, 897 (8th Cir. 1999)("When requesting appointment of counsel, the burden is on the defendant to show that he is 'financially unable' to afford representation."); United States v. Harris, 707 F.2d at 660 (stating that, although the CJA is silent "on the allocation of the burden of proof in proceedings to determine whether counsel should be appointed or terminated, the weight of authority is that the burden rests with the defendant"). The defendant's burden to demonstrate his or her financial inability to pay is by the preponderance of the evidence. See United States v. Harris, 707 F.2d 661 (stating that, if a defendant "fails to prove by a preponderance of the evidence that he is financially unable to afford counsel, appointed counsel may be terminated"); United States v. Quinlan, 223 F. Supp. 2d 816, 817 (E.D. Mich. 2002)(Feikens,

J.)("The defendant must present evidence sufficient to prove by a preponderance of the evidence that he is financially unable to employ counsel."); United States v. Simmers, 911 F. Supp. 483, 486 (D.Kan.1995)(Newman, M.J.)("Where the defendant's inability to employ counsel has been put in doubt, the defendant has the burden of coming forward with evidence sufficient to prove by a preponderance of the evidence that he is financially unable to employ counsel.").

In United States v. Harris, the United States Court of Appeals for the Second Circuit upheld the Magistrate Judge's termination of appointed counsel. See United States v. Harris, 707 F.2d at 654. At his arraignment, the defendant submitted a financial affidavit requesting appointment of counsel, which indicated that he earned $1,000.00 a month and did not own any property. 707 F.2d at 654-55, 660. The United States later moved for a determination that the defendant was financially able to obtain counsel, because they had evidence that the defendant's family income was $70,000.00 per year in 1980, and $30,000.00 per year in 1981. See 707 F.2d at 655, 660. In response, the defendant's attorney submitted an affidavit, which disclosed the defendant's earnings and contended that his financial affidavit was accurate, but the defendant declined to submit any further evidence unless he was allowed to submit the evidence ex parte. See 707 F.2d at 655, 660-61. The Magistrate Judge concluded that, on the record, the defendant had not established his need for appointed counsel, and issued an order terminating the appointment of counsel for the defendant. See 707 F .2d at 655. The Second Circuit subsequently affirmed the Magistrate Judge's determination on the same grounds. See 707 F.2d at 661-62.

The Court has previously determined that a defendant showed, by the preponderance of the evidence, that he could not afford an attorney when he demonstrated that his income was approximately $20,000.00 per year and he had a significant amount of debt. See United States v. Sandoval, No. 09-3456, Memorandum Opinion and Order at 5 (D.N.M. Jan. 28, 2011)(Browning,

J.)(Doc. 41). Although the United States presented evidence that the defendant's past annual income had been substantially higher than $20,000.00 per year, the Court reasoned that the $20,000.00 per year figure was the more appropriate number to consider, in part because the United States' evidence came from several years prior. See United States v. Sandoval, MOO at 7-8. It also reasoned that the defendant had presented substantial evidence that his expenses had "drained away" any assets he had attained by the higher monthly income; namely, the defendant demonstrated that he had lost his pre-indictment attorney, because he was unable to pay her, so the Court reasoned that the defendant's "substantial prior income was used to compensate his former attorney." United States v. Sandoval, MOO at 8-9. Finally, it determined that the defendant's substantial debt, including some medical debt from a kidney condition, which amounted to $245,721.64, coupled with his current monthly income demonstrated that he could not afford an attorney. See United States v. Sandoval, MOO at 10-11. See also United States v. Chavez, 2014 WL 936721, at *8, *8 n.3 (D.N.M. March 6, 2014)(Browning, J.)(concluding that a defendant could not pay for an attorney, because he had lost his previous job as a probation and parole officer, currently worked at Target, and had previously been paying for three private attorneys).

## ANALYSIS

The Court concludes that Gutierrez is not financially qualified for CJA. He has about $800,000.00 in assets in an annuity. He has few living expenses and almost no debt. The amount the United States is seeking in restitution is a fraction of that annuity, and the projected cost of a trial attorney is also less than the annuity's value. Because of those significant net assets and a calculation that he can pay for restitution and for an attorney and still have some assets remaining, the Court concludes that Gutierrez does not qualify for CJA. Based on his CJA ineligibility and the

substantial assets that Gutierrez has available, the Court also concludes that Gutierrez must make a payment to the Treasury for the services the Federal Public Defender's Office rendered.

## I.  GUTIERREZ IS INELIGIBLE FOR CJA, BECAUSE OF HIS SUBSTANTIAL ASSETS AND NEGLIGIBLE LIABILITIES.

Based on his net assets, Gutierrez is ineligible for CJA.  Under the CJA, a court shall appoint counsel to represent the defendant if it is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel."  18 U.S.C. § 3006A(b).  "Appropriate inquiry necessarily varies with the circumstances presented, and no one method or combination of methods is required.  Investigation of the applicant's assets, liabilities, income and obligations alone may constitute sufficient inquiry."  United States v. Barcelon, 833 F.2d at 897 (footnote and citations omitted).  A court may also consider

> the needs of the defendant and his family, United States v. Harris, 707 F.2d 653, 661 (2nd Cir. [1983]), cert. denied, 464 U.S. 997 . . . (1983); U.S. v. Bracewell, 569 F.2d 1194, 1200 (2nd Cir. 1978); the amount the defendant posted as bail, see VII Guide to Judiciary Policies and Procedures: Appointment of Counsel in Criminal Cases ¶ 2.04 at 2-11 (1987); the expense and extent of legal services which the defendant requires, Harris, 707 F.2d at 661, United States v. Coniam, 574 F. Supp. 615, 618 (D.Conn.1983); United States v. Hennessey, 575 F. Supp. 119, 121 (N.D.N.Y.1983), aff'd 751 F.2d 372 (2nd Cir. 1984); amounts given the defendant by others for limited purposes only, Bridges v. United States, 588 F.2d 911, 912 (4th Cir. 1978); United States v. Bursey, 515 F.2d 1228, 1236 (5th Cir. 1975); whether the defendant has secreted assets, United States v. Rubinson, 543 F.2d 951, 964 (2nd Cir. [1976]), cert. denied, 429 U.S. 850 . . . (1976); United States v. Schmitz, 525 F.2d 793, 794-95 (9th Cir. 1975); and the availability of income to the defendant from other sources such as a spouse, United States v. Caudle, 758 F.2d 994 (4th Cir. 1985), or trusts, estates or the like. See, e.g., United States v. Kahan, 415 U.S. 239 . . . (1974); Schmitz, 525 F.2d at 794-95.  In addition to these factors the court may also refuse to appoint counsel if it finds that the defendant's portrayal of financial inability lacks credibility.  See United States v. Binder, 794 F.2d 1195, 1202 (7th Cir. [1986]), cert. denied, 479 U.S. 869 . . . (1986); United States v. Kelly, 467 F.2d 262, 266 (7th Cir. 1972); United States v. Martinez-Torres, 556 F. Supp. 1275, 1280 (S.D.N.Y. 1983); United States v. Wright, 478 F. Supp. 1178 (S.D.N.Y. 1979).

United States v. Barcelon, 833 F.2d at 897 n.5 (brackets added).

> If at any time after the appointment of counsel, the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate.

18 U.S.C. § 3006A(c).

Gutierrez' assets, as of September 28, 2016, were considerable. His largest asset was an annuity valued at $800,000.00. In Camera Tr. at 31:16-17 (Gutierrez). His other assets, although much less than the annuity, were still significant amounts, including: a car valued approximately at $8,000.00; other personal property valued at about $15,000.00; and a time share valued at around $15,000.00. See In Camera Tr. at 32:18-22 (Court, Gutierrez); id. at 33:10-12 (Court, Gutierrez); id. at 35:8-10 (Gutierrez). In sum, his assets on September 28, 2016, were $838,000.00. To be sure, those assets are not all liquid, but Gutierrez believed that he would be able to draw a larger lump sum from the annuity to pay for an attorney. See In Camera Tr. at 41:17-19 (Gutierrez). Cf. United States v. Konrad, 730 F.3d 343, 348 (3d Cir. 2013)(concluding that a court may count less-than-liquid assets in the CJA calculation). Even if he could not draw some larger sum from the annuity, Gutierrez attested that he had a credit line upon which he could draw for a lump sum to pay for an attorney. See In Camera Tr. at 41:19-20 (Gutierrez). Moreover, the monthly distribution from the annuity -- $6,400.00 per month after taxes, or $76,800 per year -- is a dependable income stream with which Gutierrez is likely able to fashion some payment arrangement with an attorney. See In Camera Tr. at 30:21-31:12 (Court, Gutierrez).

In contrast to his assets, Gutierrez has few monthly liabilities. He does not own a home. See In Camera Tr. at 32:5-8 (Gutierrez). The Pueblo of Pojaque owns the home in which Gutierrez lives, but it does not charge Gutierrez rent; rather, the Pueblo of Pojaque gives Gutierrez a $600.00 per month stipend to maintain that home. See In Camera Tr. at 32:5-8 (Gutierrez); id. at 33:24-34:2

(Court, Gutierrez). Gutierrez pays the balance of his credit card every month, so has no credit card debt. See In Camera Tr. at 35:18-36:4 (Court, Gutierrez). He has other, typical, monthly expenses, such as utility charges, cable bills, cellular telephone costs, and time share maintenance fees, but he has no debt. See In Camera Tr. at 35:16-17 (Gutierrez). Finally, Gutierrez has no dependents. See In Camera Tr. at 36:17-18 (Gutierrez).

With his assets greatly outweighing his liabilities, the Court concludes that Gutierrez is CJA ineligible. See United States v. Barcelon, 833 F.2d at 897; United States v. Simmers, 911 F. Supp. at 486-87 (concluding a defendant could afford to pay for an attorney when he had assets in excess of $100,000.00 to pay for an attorney). That the United States seeks restitution for Gutierrez' outstanding tax bills does not change the Court's determination, because the restitution sought, and ultimately obtained -- $174,196.00 -- was less than a quarter of Gutierrez' assets. See Sentencing Tr.at 9:6-7 (Court). Moreover, even subtracting that amount from his assets, Gutierrez still has enough to cover a quoted attorney's estimated cost of $100,000.00. See In Camera Tr. at 42:8-10 (Gutierrez); Third Tr. at 21:2-3 (Gutierrez, Vierbuchen). Accordingly, the Court concludes "that the person is financially able to obtain counsel," so it "terminate[s] the appointment" of Mr. Butcher, Assistant Federal Public Defender, as Gutierrez' counsel. 18 U.S.C. § 3006A(c).

## II. GUTIERREZ MUST PAY THE TREASURY FOR SERVICES RENDERED, BECAUSE HE IS FINANCIALLY ABLE TO MAKE THAT PAYMENT.

Because Gutierrez has significant assets, the Court determines that, in the interests of justice, Gutierrez should make a payment to the Treasury for services rendered. Under CJA, "[i]f at any time after the appointment of counsel, the United States magistrate judge or the court finds that the person is financially able . . . to make partial payment for the representation, it may . . . authorize payment as provided in subsection (f), as the interests of justice may dictate." 18 U.S.C. § 3006A(c). Under subsection (f),

> Whenever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section.

18 U.S.C. § 3006A(f).[11] When ordering payment to the Treasury, other federal district courts have ordered payment to be made to the clerk of the court for the district court issuing the order for payment into the United States Treasury. See, e.g., United States v. Meyer, 2013 WL 3353771, at *3 (D. Ariz. July 3, 2013)(Anderson, M.J.); United States v. Stevenson, 2012 WL 1038832, at * 4 (W.D. Pa. March 28, 2012)(Diamond, J.). See also United States v. Waldron, 270 F. App'x at 533 (affirming a district court's decision to order payment to be payable to the clerk of the district court to be deposited into the treasury). 18 U.S.C. § 3006A does not specify how payment should be calculated for Federal Public Defenders. See 18 U.S.C. § 3006A; United States v. Waldron, 270 F. App'x at 534. Most courts have borrowed the fee calculation from 18 U.S.C. § 3006A(d) used for CJA-appointed attorneys. See United States v. Waldron, 270 F. App'x at 534; United States v. Meyer, 2013 WL 3353771, at *4; United States v. Stevenson, 2012 WL 1038832, at *4.

---

[11]Subsection (f) also authorizes payments to the "appointed attorney," the "bar association or legal aid agency or community defender organization which provided the appointed attorney." 18 U.S.C. § 3006A(f). The Federal Public Defender's Office, by statute, does not qualify as a "community defender organization," 18 U.S.C. § 3006A(g)(2)(A), and does not fit the plain meanings of "appointed attorney," "bar association," or "legal aid agency." To be sure, the Court or a magistrate judge, when appointing the Federal Public Defender's Office, technically appoints the Federal Public Defender, who is an attorney, who in turn appoints an Assistant Federal Public Defender to take the case. The Court concludes, however, that "appointed attorney" means a CJA appointed attorney and not the Federal Public Defender. The statute indicates that the meaning of "appointed attorney" means a private attorney or an attorney who charges for his or her services. 18 U.S.C. § 3006A(d). In contrast, a Federal Public Defender does not charge for his or her services and is, by statute, forbidden from the private practice of law. See 18 U.S.C. § 3006A(g)(2)(A). Accordingly, the Court concludes that the appropriate reimbursement provision under 18 U.S.C. § 3006A(f) for the Federal Public Defender's Office is to "the court for deposit in the Treasury." 18 U.S.C. § 3006A(f). See United States v. Waldron, 270 F. App'x 531, 533 (9th Cir. 2008)(unpublished)(affirming a district court's decision to reimburse the Federal Public Defender's Office by way of the Treasury).

The United States Court of Appeals for the Third Circuit, however, has taken another approach and has required the defendant to pay the reasonable market rate of a private attorney even if the Assistant Federal Public Defender represented, for a time, the defendant. See United States v. Konrad, 730 F.3d at 351.[12] Construing the phrase "such funds be paid . . . in the Treasury as a reimbursement to the appropriation," 18 U.S.C. § 3006A(f), the Third Circuit recognized two possible statutory meanings: (i) "to pay back the value received in legal services"; or (ii) "to pay back the cost expended on the legal defense," United States v. Konrad, 730 F.3d at 351. The "value received in legal services" would equal the reasonable cost of a private attorney, whereas the "cost expended on the legal defense" would equal the CJA rate. United States v. Konrad, 730 F.3d at 351. With those two possible meanings in mind, the Third Circuit concluded that the latter definition was correct. It reasoned that, because "reimbursement" means "to pay back," and because "[a]ppropriation" means the "fund or sub-fund appropriated by Congress for court-appointed attorneys representing those who cannot afford legal counsel," the statute's most natural meaning is to "pay back the value received" or, put another way, "the amount of benefit" the "ineligible defendant" received. United States v. Konrad, 730 F.3d at 351. See id. ("Reimbursement more properly refers to the money that Konrad would have paid to a private attorney had he accurately completed the financial disclosure affidavit, rather than falsifying his financial information."). It also reasoned, as a policy matter, a defendant who can afford legal counsel "should not benefit from his incomplete, undervalued or untruthful financial disclosures by receiving legal services" from the

---

[12]The Honorable Anthony Scirica, Circuit Judge for the Third Circuit, authored United States v. Konrad and was joined by the Honorable Thomas Ambro, Circuit Judge for the Third Circuit. See 730 F.3d at 345. The Honorable Julio Fuentes, Circuit Judge for the Third Circuit, concurred in part and dissented in part. See 730 F.3d at 352. Judge Fuentes' dissent is considered infra.

Federal Public Defender's Office "at a fraction of the cost" that he would otherwise have to pay for a private attorney. United States v. Konrad, 730 F.3d at 351-52.[13]

The Court agrees with the Third Circuit's premises that "reimbursement" means "to pay back" and that "[a]ppropriation" means the "fund or sub-fund appropriated by Congress for court-appointed attorneys representing those who cannot afford legal counsel," United States v. Konrad, 730 F.3d at 351, but disagrees with the Third Circuit's conclusion from those premises. If appropriation means the funds that Congress has set aside to pay CJA attorneys, it does not follow that the defendant should have to pay for the reasonable rate of a private attorney. Congress has planned to pay CJA rates, which, as the Third Circuit recognizes, are "universally recognized as a below-market rate for criminal defense attorneys." United States v. Konrad, 730 F.3d at 351.[14]

---

[13]The Third Circuit also asserts that, separate from policy reasons, "[o]rdering reimbursement at a lower rate than the cost of private representation would be contrary to the statute by subsidizing the cost of counsel to a defendant who is able to pay." United States v. Konrad, 730 F.3d at 351 (emphasis added). For the reasons explained below, the Court concludes that reimbursement at a rate lower than a reasonable private attorney's rate would not be contrary to the statute.

[14]The Third Circuit commentary that CJA rates "are universally recognized as a below-market rate for criminal defense attorneys" is probably true in Pennsylvania, Delaware, and New Jersey. United States v. Konrad, 730 F.3d at 346, 351 (noting that the CJA rate was $125.00 per hour and that a reasonable private rate in the Third Circuit was $400.00 per hour). While the Court is not as knowledgeable about the local federal criminal attorney rates as it is about local federal civil rates, the Court is confident that, with New Mexico being a poor state, the gap between CJA rates and private rates is not as much here as it is in the Third Circuit. See Research & Polling Inc., The Economics of Law Practice in New Mexico May 2017, at 17 (2017)(listing the mean rate for New Mexico criminal defense attorneys at $217.00 per hour). A CJA lawyer in New Mexico can make a good, comfortable living.

   The Court also notes that there may be reasons, other than money, that attorneys take CJA cases. Practicing in federal court can be prestigious. Good, but young, lawyers can make reputations that they would never be able to make in drug or DWI cases in state, municipal, or metropolitan court, even at full hourly rates. A good federal trial for a young or even a journeyman attorney can be worth more on a resume than a dozen state pleas. Similarly, there are established lawyers, like Clarence Darrow in his prime, who are not attracted to cases because of the money. Federal criminal issues may simply be more attractive than state criminal issues to those attorneys.

   In terms of money, while it may be true that CJA rates are less than private rates, a CJA case has something that a private case does not -- the payout is guaranteed by the entity that prints the

Thus, Congress has not set aside funds to pay a reasonable private attorney's rates, but has, instead, set aside funds for CJA rates. See 18 U.S.C. § 3006A(d), (i). If the Court follows the Third Circuit's guidance, the United States would receive more money into the fund than Congress appropriated. Such a result is incompatible with the statute's meaning that the defendant should pay back the money that Congress has set aside for those legal services. The CJA, in short, does not authorize a windfall to the United States. See United States v. Konrad, 730 F.3d at 354 (Fuentes, J., dissenting)("Having the Government profit from a court's reimbursement order is antithetical to the very concept of reimbursement.").

The Third Circuit also reasoned that defendants should not be incentivized to lie on their financial affidavits so that they may retain and later pay for a public defender -- a defense attorney often as good as a private attorney -- at a fraction of a private attorney's cost. See United States v. Konrad, 730 F.3d at 351-52. There is some merit to that reasoning, but the Court determines that such a policy consideration is Congress' domain and not the Court's. Further, there is already a strong disincentive for defendants to lie on their financial affidavits: the threat of a perjury charge. See United States v. Konrad, 730 F.3d at 354 (Fuentes, J., dissenting)("I doubt the desire for subsidized legal costs will drive those with means to pay for private counsel to risk a conviction and prison time for a randomly assigned public defender."). Moreover, the Third Circuit's reasoning sweeps in defendants, such as Gutierrez, who state their intention to hire an attorney, see Financial Affidavit at 1 (stating that Gutierrez "wants to hire attorney"), but were appointed an Assistant

---

money. In a private case, attorneys have to worry about actually getting paid, so sometimes negotiate an up-front flat fee, leaving some money on the table if he or she had charged an hourly rate. In a CJA case, in contrast, the attorney does not have to worry about the United States paying out.

Federal Public Defender nonetheless.[15]  While there is an argument that those defendants who can pay but were erroneously appointed counsel should still pay the price of a private attorney, because they can afford one and have always been able to afford one, the Third Circuit's rule disincentives the judiciary from carefully inquiring into the defendant's intentions or their financial means knowing that any mistake it makes will be cleaned up later and the United States will receive a bonus payment from any mistake to boot.  Moreover, because of the judiciary's mistake, those defendants are already required to spend more money than they otherwise would have had to pay.  Once the mistake is discovered, the defendant's new private attorney must come up to speed on the case, which takes time and costs money.  If there had been no mistake to begin with, the defendant would have had that private attorney all along and that additional cost would not incur.

There is also the practical consideration of how to calculate what a reasonable private criminal defense attorney would cost.  The Court has had many occasions to consider a reasonable private attorney's fees in civil matters, see e.g., Payne v. Tri-State Careflight, LLC, 278 F. Supp. 3d 1276, 1296 (D.N.M. 2017)(Browning, J.), but it cannot think of nor can it find a case in which it had to determine a reasonable fee or rate for a private criminal attorney.  Most often, when determining civil attorney's fees, it has the benefit of the private attorneys arguing about what their time is valued at through evidence of past rates charged and other evidence.  See Payne v. Tri-State Careflight, LLC, 278 F. Supp. 3d at 1297 ("The party entitled to fees must provide the district court with sufficient information to evaluate prevailing market rates.").  An Assistant Federal Public Defender, however, would not readily have that evidence to present to the Court.  Although there is some evidence in this case that a private attorney would value Gutierrez' case at $100,000.00 from

---

[15]Gutierrez never asked for an Assistant Federal Public Defender.  See Third Tr. at 17:20-24 (Gutierrez, Vierbuchen).

September 28, 2016 forward, see In Camera Tr. at 42:8-10 (Gutierrez); Third Tr. at 21:2-3 (Gutierrez, Vierbuchen), that quote is just one data point. Moreover, the Court cannot reduce that amount to a rate to apply to Mr. Butcher's hours, because there is no indication how many hours that attorney thought she would spend on the case to charge $100,000.00. See In Camera Tr. at 42:8-10 (Gutierrez); Third Tr. at 21:2-3 (Gutierrez, Vierbuchen). The Court could ask private attorneys to submit rates and calculate a reasonable rate from those submissions, as the district court's appointed special master did in United States v. Konrad, see 730 F.3d at 352, or it could use the mean or median rate from the survey on New Mexico attorney's rates that the New Mexico Bar Association commissioned, see Research & Polling Inc., The Economics of Law Practice in New Mexico May 2017, at 17 (2017) available at https://www.nmbar.org/nmbardocs/pubres/reports/2017Lawyer CompensationSurvey.pdf ("NM Bar Survey")(listing the mean rate for New Mexico criminal defense attorneys at $217.00 per hour and the median rate at $224.00 per hour). Both approaches present problems, however. The former suffers from a potential selection bias possibly skewing the reasonable rate. The latter approach is also possibly a skewed view of the reasonable rate, because only eleven percent of New Mexico attorneys responded to the survey. See NM Bar Survey at 3. Given those potential problems, the Court is hesitant to embrace an already suspect statutory interpretation.

Accordingly, the Court follows the majority of courts to consider the issue and will use the CJA rate to calculate the amount Gutierrez owes to the Treasury. See, e.g., United States v. Waldron, 270 F. App'x at 534; United States v. Meyer, 2013 WL 3353771, at *4; United States v. Stevenson, 2012 WL 1038832, at *4. As those courts have also recognized, 18 U.S.C. § 3006A(f) applies not only to attorney's fees but paralegal and investigator's fees incurred during the representation. See, e.g., United States v. Stevenson, 2012 WL 1038832, at *4. The Court,

therefore, orders that Gutierrez not only pay for the cost of the Assistant Federal Public Defenders who worked on his case, but also for Ms. Porter, a Federal Public Defender paralegal, and for Ms. Guardiola, a Federal Public Defender investigator.

**IT IS ORDERED** the United States' Motion to Show Cause, filed August 8, 2016 (Doc. 29), is granted. Defendant Darryl Gutierrez shall pay $18,914.77 to the Clerk of the Court for the District of New Mexico for deposit in the United States Treasury to the District of New Mexico's CJA appropriation. That amount reflects the fees and costs that the Federal Public Defender's Office incurred by representing him from December 2, 2015, until November 1, 2016. The fees costs are calculated as follows:

- $14,685.84 for work that Assistant Federal Public Defender Butcher performed (26.85 hours at $127.00/hour and 87.41 hours at $129.00/hour);

- $86.43 for work that Assistant Federal Public Defender Winterbottom performed (.67 hours at $129.00/hour);

- $2,017.50 for work that Stephanie Porter, the Federal Public Defender paralegal, performed (79.26 hours at $25.00/hour);

- $2,125.00 for work that Maclovia Guardiola, the Federal Public Defender investigator, performed (42.5 hours at $50.00/hour).

The payment should be made by check or money order to the Clerk of the Court for deposit in the Treasury.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

John C. Anderson
   United States Attorney
Reeve L. Swainston
Holland S. Kastrin
Margaret M. Vierbuchen
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

     *Attorney for the Defendant*